## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CORREY DELOZIER, ET AL.,**          CIVIL ACTION
   **Plaintiffs**

**VERSUS**                            NO.  18-14094

**S2 ENERGY OPERATING, LLC, ET AL.,**  SECTION: "E" (2)
   **Defendants**

## ORDER AND REASONS

Before the Court is Defendant Wood Group PSN, Inc.'s ("Wood Group") motion for summary judgment on the two negligence claims filed against it by Plaintiffs.[1]

## BACKGROUND

Plaintiff Correy Delozier alleges he was working as an offshore operator, doing work on S2 Energy Operating, LLC's ("S2") fixed platforms and wells in the Timbalier Bay Field, when he sustained significant injuries by being "crushed" as he transferred from a crew boat to a fixed drilling platform.[2] Delozier and his wife, Valerie Delozier, filed suit against S2, Pioneer Production Services, Inc. ("Pioneer"), Wood Group, and Stephen Dauzat seeking damages for his injuries and her loss of consortium.

## STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

---

[1] R. Doc. 35. Plaintiffs opposed the motion. R. Doc. 46. Defendant S2 Energy Operating, LLC opposed the motion. R. Doc. 51. Defendant Wood Group replied in support of its motion. R. Doc. 58. Plaintiffs filed a supplemental memorandum in opposition. R. Doc. 96. Defendant Wood Group filed a supplemental reply in support of its motion. R. Doc. 114. Plaintiffs provided a supplemental response to Defendant Wood Group's statement of undisputed material facts. R. Doc. 134.
[2] R. Doc. 68 at ¶ XIX.

of law."[3] "An issue is material if its resolution could affect the outcome of the action."[4] When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[5] All reasonable inferences are drawn in favor of the nonmoving party.[6] There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the nonmoving party, no reasonable trier of fact could find for the nonmoving party, thus entitling the moving party to judgment as a matter of law.[7]

If the dispositive issue is one on which the moving party will bear the burden of persuasion at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"[8] If the moving party fails to carry this burden, the motion must be denied. If the moving party successfully carries this burden, the burden of production then shifts to the nonmoving party to direct the Court's attention to something in the pleadings or other evidence in the record setting forth specific facts sufficient to establish that a genuine issue of material fact does indeed exist.[9]

If the dispositive issue is one on which the nonmoving party will bear the burden of persuasion at trial, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the nonmovant's claim, or (2) demonstrating there is no evidence in the record to establish an essential

---

[3] Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).
[4] *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).
[5] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).
[6] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[7] *Smith v. Amedisys, Inc.*, 298 F.3d 434, 440 (5th Cir. 2002).
[8] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)).
[9] *Celotex*, 477 U.S. at 322–24.

element of the nonmovant's claim.[10] When proceeding under the first option, if the nonmoving party cannot muster sufficient evidence to dispute the movant's contention that there are no disputed facts, a trial would be useless, and the moving party is entitled to summary judgment as a matter of law.[11] When, however, the movant is proceeding under the second option and is seeking summary judgment on the ground that the nonmovant has no evidence to establish an essential element of the claim, the nonmoving party may defeat a motion for summary judgment by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party."[12] Under either scenario, the burden then shifts back to the movant to demonstrate the inadequacy of the evidence relied upon by the nonmovant.[13] If the movant meets this burden, "the burden of production shifts [back again] to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)."[14] "Summary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court

---

[10] *Id.* at 331–32 (Brennan, J., dissenting); *see also St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987) (citing Justice Brennan's statement of the summary judgment standard in *Celotex*, 477 U.S. at 322–24, and requiring the Movers to submit affirmative evidence to negate an essential element of the nonmovant's claim or, alternatively, demonstrate the nonmovant's evidence is insufficient to establish an essential element); *Fano v. O'Neill*, 806 F.2d 1262, 1266 (citing Justice Brennan's dissent in *Celotex*, and requiring the movant to make an affirmative presentation to negate the nonmovant's claims on summary judgment); 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE §2727.1 (2016) ("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case." (internal citations omitted)).
[11] *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89 (1980); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).
[12] *Celotex*, 477 U.S. at 332–33.
[13] *Id.*
[14] *Celotex*, 477 U.S. at 332–33, 333 n.3.

determines that the moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial."[15]

"[U]nsubstantiated assertions are not competent summary judgment evidence. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports the claim. 'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'"[16]

## ANALYSIS AND LAW

Plaintiff Correy Delozier's Third Amended Complaint asserts causes of action against Wood Group based on (1) *respondeat superior* liability for negligence on the part of its employee Stephen Dauzat,[17] and (2) failure to "properly train employees and/or hiring and/or retaining careless and/or unskilled employees."[18] Wood Group seeks summary judgment in its favor on both negligence claims.[19]

## I.   Summary Judgment is Denied with Respect to Wood Group's *Respondeat Superior* Liability for Dauzat's Alleged Negligence.

The Plaintiffs allege Wood Group is liable for Dauzat's failure to properly operate, maintain and/or control the M/V Miss Michelle and his failure to properly navigate the vessel.[20] The parties dispute which law applies to this negligence claim. Plaintiffs argue general maritime law and Louisiana state law jointly apply.[21] Wood Group argues this

---

[15] *Id.*; *see also First National Bank of Arizona*, 391 U.S. at 289.
[16] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 324; *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) and quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).
[17] R. Doc. 68 at XXX.
[18] *Id.* at XXII(8).
[19] R. Doc. 35.
[20] R. Doc. 68 XII(1)-(2).
[21] R. Doc. 156 at 2.

claim is governed by general maritime law.[22] S2 Energy argues Louisiana state law applies.[23]

### A.    Louisiana Law Determines Wood Group's Respondeat Superior Liability for Dauzat's Alleged Negligence.

The analysis for determining whether general maritime law applies to the Plaintiffs' tort claim based on respondeat superior liability for Dauzat's alleged negligence is identical to the analysis for determining whether federal admiralty jurisdiction exists over the claim.[24] The Plaintiffs allege in their Third Amended Complaint the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332,[25] but also assert the action is brought "pursuant to the laws of the State of Louisiana, the Jones Act, 46 U.S.C. Sections 30104-30106, and the General Maritime Laws of the United States."[26] Generally, injured plaintiffs like the Deloziers may assert either diversity jurisdiction or admiralty jurisdiction for their maritime tort claims.[27] Regardless of the jurisdiction invoked in the Plaintiffs' pleadings, substantive federal maritime law will govern if the claim is within constitutional and statutory grants of admiralty jurisdiction.[28] If admiralty jurisdiction is established, "then all of the substantive rules and precepts peculiar to the law of the sea become applicable."[29]

In *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, the Supreme Court set forth the test for establishing admiral jurisdiction over tort claims and, thus, the test

---

[22] R. Doc. 158 at 2.

[23] R. Doc. 159 at 2.

[24] *Hamm v. Island Operating Co., Inc.*, 450 Fed.Appx. 365, 368 (5th Cir. 2011) (citing *May v. Transworld Drilling Co.*, 786 F.2d 1261, 1265 (5th Cir. 1986)).

[25] R. Doc. 68 at II.

[26] Id. at IV.

[27] *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 204 (1971).

[28] *Id. See Branch v. Schumann*, 445 F.2d 175, 177-78 (5th Cir. 1971) (holding that admiralty retains exclusive jurisdiction notwithstanding the diversity character of the litigation.).

[29] *Branch*, 445 F.2d at 178. *See Adamson v. Port of Bellingham*, 907 F.3d 1122 (9th Cir. 2018) (holding that substantive maritime law will control a claim regardless of the forum or asserted basis of jurisdiction).

for determining whether general maritime law applies to a cause of action in tort.[30] The Supreme Court adopted a two-pronged analysis focusing first on location and then on connection with maritime activity:

> [A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. The connection test raises two issues. A court, first, must assess the general features of the type of incident involved, to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.[31]

The location prong is satisfied by either (1) a tort occurring wholly on navigable water[32] or (2) an injury suffered on land that was caused by a vessel on navigable water.[33] The Fifth Circuit in *Egorov, Puchinsky, Afanasiev, & Juring v. Terriberry, Carrol & Yancey*, held that to determine whether a tort occurred on navigable water the court must look to where the harm "took effect" rather than the "locus of the allegedly tortious conduct."[34] In this case, the parties agree Delozier was injured after he stepped off the crew boat and was scrambling onto the SF4 fixed platform.[35] Delozier testified he was hanging onto a piling supporting the fixed platform when the crew boat hit his right ankle

---

[30] *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 533-34 (1995). This test has been cited with approval in the Fifth Circuit. *See In re Louisiana Crawfish Producers*, 772 F.3d 1026 (5th Cir. 2014) (applying the *Grubart* analysis).

[31] *Id.* at 533 (internal citations and quotation marks omitted); *see also Gulf Coast Shell and Aggregate LP v. Newlin,* 623 F.3d 235, 240 (5th Cir. 2010).

[32] *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 253 (1972) (recognizing the longstanding principle that where "the wrong occurred on navigable waters, the action is within admiralty jurisdiction."). *See The Plymouth*, 70 U.S. 20, 36 (1865) ("Every species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance.").

[33] The Admiralty Extension Act, 46 U.S.C. 30101. *See Jerome B. Grubart, Inc.*, 513 U.S. at 533.

[34] *Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carrol & Yancey*, 183 F.3d 453, 456 (5th Cir. 1999).

[35] R. Doc. 68 at ¶¶ XVII, XIX, XX; R. Doc. 105-11 at ¶ 14; R. Doc. 110-2 at ¶ 2; R. Doc. 137 at 18; R. Doc. 138 at 2. There is no dispute the MISS MICHELLE was a vessel on navigable waters.

and leg, pinning him between the crew boat and the piling.[36] Although the alleged tortious conduct—Dauzat's negligent driving of the crew boat and his alleged instruction to Delozier "to climb upon the well,"[37] occurred on navigable water—the harm took effect on the fixed platform where Delozier was located when his ankle and leg were crushed by the boat. Because the harm took effect on the fixed platform, the tort did not occur wholly on navigable water.

Because the tort did not occur on navigable water, the general location rule supporting admiralty jurisdiction over a claim does not apply. The Admiralty Extension Act created an exception to the general rule by extending admiralty jurisdiction to "cases of injury or damage, to person or property, *caused by a vessel on navigable waters*, even though the injury or damage is done or consummated on land."[38] The Act provides that

> The admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.[39]

Cases decided soon after the Admiralty Extension Act examined whether a tort committed by the negligence of the vessel's personnel was considered to be *caused* by the vessel. In *Gutierrez v. Waterman S.S. Corp.*, a longshoreman slipped on loose beans spilled on a dock after the beans had been defectively packaged aboard a ship.[40] The Supreme Court held "[t]here is no distinction in admiralty between torts committed by the ship itself and by the ship's personnel while operating it, any more than there is between torts 'committed' by a corporation and by its employees."[41] This interpretation

---

[36] Correy Delozier Dep. 51:9-52:1.
[37] R. Doc. 68 at XVIII.
[38] 46 U.S.C. § 30101(a) (emphasis added).
[39] 46 U.S.C. 30101(a).
[40] *Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 207 (1963).
[41] *Id*. at 210.

of the statute was clarified in *Victory Carriers, Inc. v. Law*, in which the Supreme Court required the injury be caused by a ship or its appurtenance, rather than the vessel's personnel, in order for admiralty jurisdiction to apply.[42] In line with Supreme Court precedent, the Fifth Circuit has held "the Extension Act is meant to apply to the vessel and her appurtenances 'and does not include those performing actions for the vessel.'"[43] "The vessel or its defective appurtenances must be the proximate cause of the accident."[44] The alleged negligence in the instant case is Dauzat's operation of the M/V MISS MICHELLE, not defects in the vessel or its appurtenances.[45] The location prong of the admiralty jurisdiction inquiry is not satisfied and general maritime law does not apply.

Even if the location prong were satisfied, the second prong, a traditional maritime connection, is not satisfied. To meet the second prong, the court must assess the connection between the activity giving rise to the incident and traditional maritime activity by applying a two-step test.[46] First, the court must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce.[47] Second, the court must determine whether the general character of the activity giving rise to the incident has a substantial relationship to traditional maritime activity.[48]

---

[42] *Victory Carriers, Inc. v. Law*, 404 U.S. 202 (1971).

[43] *Dahlen v. Gulf Crews, Inc.*, 281 F.3d 487, 493 (5th Cir. 2002) (quoting *Egorov*, 183 F.3d 453, 456 (5th Cir. 1999).

[44] *Margin v. Sea-Land Services, Inc.*, 812 F.2d 973, 974 (5th Cir. 1987).

[45] *See id.* at 494 ("the defect must be in the appurtenance and not be due to the personnel performing services for the vessel.").

[46] *Jerome B. Grubart, Inc.*, 513 U.S. at 534.

[47] *Id.*

[48] *Id. See Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 677 (1982) (holding that admiralty jurisdiction exists when the wrongful conduct holds a significant connection with traditional maritime activity). In *Foremost*, the Supreme Court held admiralty jurisdiction still existed although the tort arose from two pleasure boats colliding on the Amite River in Louisiana—beyond the scope of maritime commerce. *Id.* at 674-75.

The general character of the activity giving rise to the incident in this case is oil and gas operations on a fixed platform. Fixed platforms are treated as artificial islands and are not within admiralty jurisdiction.[49] Injuries sustained by workers during transfers between a fixed platform and a vessel in navigable waters have been held to be neither potentially disruptive to maritime commerce nor substantially related to traditional maritime activity.[50] The foreseeable economic disruption this incident posed is to the oil and gas operations on the platform, not commercial activities at sea. The Fifth Circuit has held the suspension of oil and gas operations poses no "more than a fanciful risk to commercial shipping."[51] In *Herb's Welding, Inc. v. Gray*, the Supreme Court found that, unlike piers, "drilling platforms were not even suggestive of traditional maritime affairs."[52]  The general character of the activity giving rise to this incident does not bear a substantial relation to traditional maritime activities.

The Court lacks admiralty jurisdiction over this negligence claim. Because the S2 SF4 fixed platform is in Louisiana's territorial waters, Louisiana law applies.

### B.    Louisiana's Dual Employer Doctrine Applies.

The maritime approach to the borrowed employee doctrine is rooted in the seminal case of *Standard Oil v. Anderson*, in which an injured longshoreman sued a shipowner after the ship's winchman negligently dropped cases of oil on him.[53] At the time of the accident, the winchman was assisting the dock's stevedore unload the ship.[54]  The

---

[49] *See Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 360 (1969) ("[The platforms] were islands, albeit artificial ones, it was an island, albeit an artificial one, and the accidents had no more connection with the ordinary stuff of admiralty than do accidents on piers.").

[50] *Hufnagel v. Omega Serv. Industries, Inc.*, 182 F.3d 340, 349 (5th Cir. 1999). *See Hicks v. BP Exploration & Production, Inc.*, 308 F.Supp.3d 878, 890 (E.D. La. 2018) (holding that state law applied when a platform electrical worker whose personnel basket between the platform and vessel caused him to fall).

[51] *Petrobras America, Inc. v. Vicinay Cadenas, S.A.*, 815 F.3d 211 (5th Cir. 2016).

[52] 470 U.S. 414, 421-22 (1985).

[53] 212 U.S. 215, 218 (1909).

[54] *Id.*

Supreme Court held the shipowner was relieved of liability because the winchman was doing the work of the stevedore and not the work of the shipowner.[55] In this case, Wood Group argues that, under general maritime law, liability has shifted from Wood Group to S2 because S2 is Dauzat's borrowing employer. Wood Group's argument fails as the Court has found Louisiana law applies to this cause of action.

Vicarious liability in Louisiana begins with La. Civ. Code art. 2320, which holds "employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."[56] Louisiana courts consistently have held employers are vicariously liable for any torts by their employees.[57] Historically, the borrowed employee doctrine in Louisiana shifted liability from the general employer to the borrowing employer, just as it does in general maritime law. In 1951, the Louisiana Supreme Court adopted the borrowed employer doctrine to resolve situations in which there are two potential masters who might be liable for their employee's torts.[58] In *Benoit v. Hunt Tool Co.*, the plaintiff was injured by a fuel tank explosion caused by the negligent acts of a welder generally employed by the Hunt Tool Company ("Hunt"). Hunt argued the negligent welder was actually the borrowed servant of the oil company contracting his services, thus relieving Hunt of all liability.[59] The Court found that, despite the welder's day-to-day dispatches to the oil company's site, where he took suggestions from the oil company's workers, the welder was not the borrowed employee of the oil company.[60]

---

[55] *Id.* at 225-26.

[56] La. C.C. art. 2320.

[57] *Ermert v. Hartford Ins. Co.*, 559 So.2d 467, 475 (La. 1990) (recognizing the "deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities."). This general rule was codified in La. Rev. Stat. 9:3921, which deprives employers from any "right of contribution, division, or indemnification from the employee."

[58] *Benoit v. Hunt Tool Co.*, 53 So.2d 137 (La. 1951).

[59] *Id.* at 140.

[60] *Id.* at 143.

Although the Louisiana Supreme Court rejected a finding of borrowed employee status for the welder, it recognized the borrowed employee doctrine, saying: "[i]t is often difficult where two possible masters are involved to determine which is liable for the tort, and to determine such liability we must look to the doctrine of the borrowed servant."[61] The *Benoit* court explained that either the general employer or the special employer, but not both, could be held liable. This became known as the "one master" rule by later courts.[62]

The Louisiana Supreme Court revisited the borrowed employee doctrine in *LeJeune v. Allstate Ins. Co.*, and repudiated the one master rule, instead finding both the general and special employer may be held solidarily liable for the torts of a borrowed employee.[63] In *LeJeune*, a loaned hearse driver negligently failed to stop at a red light, causing an accident that took a passenger's life. The hearse driver had been loaned from one funeral home to another and both were sued. The court found both to be liable because "the employee was loaned out to another in a continuing arrangement between the employers for their mutual benefit."[64] The court also noted the original employer continued to pay him and had the sole right to discharge him. The Court explained the shift in doctrine:

> Nevertheless, this [borrowed employee] determination should not relieve the general employer of his liability for his employee's negligent acts done in the pursuance of duties designated for him by his employer, in whose pay he continued and who had the sole right to discharge him. This is especially so in the present case, where the employee was loaned out to another in a continuing arrangement between the employers for their mutual benefit.[65]
> * * * *

---

[61] *Id*. at 140.

[62] *Id*. at 143; *Grimes v. Louisiana Medical Mut. Ins. Co.*, 29 So.3d 505, 509 (La. App. 1 Cir. Sept. 11, 2009) ("Under the "one master" rule of *Benoit*, the finding of borrowed servant status eliminated the possibility of vicarious liability on the part of the general employer.").

[63] 365 So.2d 471, 481 (La. 1978).

[64] *Id*. at 481.

[65] 365 So.2d 471, 481 (La. 1978).

A number of other jurisdictions have likewise held that both the general and special employer may be held solidarily liable for the employee's tort. We believe this to be the better rule and, accordingly, overrule expressions indicating to the contrary, as well as the two decisions of the intermediate courts which expressly held the general employer not liable to a third person for torts committed by his employee while loaned to a special employer. We conclude, therefore, that under the circumstances, Ville Platte, the general employer, is liable to the plaintiffs for the damages caused them by Lafleur while negligently driving the hearse for Mamou.[66]

The Louisiana Supreme Court reaffirmed this rule in *Blair v. Tynes*.[67] In *Blair*, the Court found both a local sheriff's office and the lessor of an event hall were liable for the negligence of a deputy sheriff who was specially hired to direct vehicle traffic for a private fundraiser at the hall. The sheriff misdirected traffic, which resulted in a deadly car accident.[68] The court held:

Our jurisprudence has held that special and general employers may be solidarily liable in tort to third parties injured by the negligence of their employees. In *LeJeune v. Allstate Ins. Co.*, 365 So.2d 471 (La. 1978), we addressed the issue of whether the general employer of a negligent employee remained liable for its employee's tort despite the fact that the employee had been borrowed to perform services for a special employer at the time of an accident. We held that a general and special employer may be solidarily liable for injuries to a third party caused by an employee's negligence.[69]

In *Ermert v. Hartford Ins. Co.*, the court explained the principle upon which the dual employer doctrine is justified:

The master's vicarious liability for the acts of its servant rests not so much on policy grounds consistent with the governing principles of tort law as in a deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities.[70]

---

[66] *Id*. at 481-82 (footnotes omitted).
[67] 621 So.2d 591 (La. 1993).
[68] *Id*. at 594-95.
[69] *Id*. at 599.
[70] *Ermert v. Hartford Ins. Co.*, 559 So.2d 467, 476 (La. 1990).

In *Morgan v. ABC Manufacturer*, Edward Morgan sued a temporary agency and alleged he was injured as a result of the agency's employee.[71] The temporary agency sought to escape liability by arguing the contracting construction company was the tortious employee's borrowing employer. The Louisiana Supreme Court further explained the justification for the borrowed employer doctrine, "[w]hile the borrowed servant defense focuses on which employer controlled the employee's actions, modern justification for employer liability is not based so much on the employer's control of the employee's actions, but on the concept of 'enterprise liability.'"[72] *Morgan* held that when "loaned employees are [the temporary services provider's] stock in trade," the general employer will remain liable for the torts of the borrowed employee.[73] Liability remains with the general employer when "a significant feature of its business is to pass control of the details of the work to its customers" and it "retains ultimate and overriding authority over its loaned workers."[74] When both employers contemporaneously control and benefit from the loaned worker's liability, both will be held liable under the Dual employer doctrine.[75]

Plaintiff argues "*Morgan* applies in the limited factual scenario where there is a payroll employee of one labor provider whose negligence injures a payroll employee of a different labor provider, while both employees are co-borrowed employees of a borrowing employer."[76] Plaintiffs' narrow interpretation of Louisiana's dual employee doctrine is

---

[71] 710 So.2d 1077 (La. 1998).
[72] *Id.* at 1083 (citing *Ermert v. Hartford Ins. Co.*, 559 So.2d 467 (La.1990) (". . . a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities.")).
[73] *Id.*
[74] *Id.*
[75] *Id.*
[76] *Id.* at 4-5

incorrect.[77] *Morgan* is not so limited and, instead, generally "allows both the borrowing and lending employer to be held liable for the torts of the employee."[78]

Wood Group brought this summary judgment motion seeking judgment in its favor that it has no liability to the Plaintiffs for Dauzat's negligence. The underlying premise of Wood Group's argument, that general maritime law applies, is faulty and the motion fails for that reason. It is not necessary for the Court to determine whether Dauzat is the borrowed employee of S2 to deny the motion. Even if the Court were to attempt to determine whether Dauzat is the borrowed servant of S2 at this point, there are material facts in dispute. Most importantly, the parties disagree over who had control over Dauzat and whether the conduct of the parties altered the terms of the Master Service Agreement between Wood Group and S2.[79] These disputes preclude summary judgment. In the similar case of *Gonzalez Elvir v. Trinity Marine Products, Inc.*, the court denied summary judgment on the borrowed employee status of a skilled welder because genuine issues of material fact arose with respect to the control and agreement factors under the *Ruiz* analysis.[80] The *Gonzalez Elvir* defendants' Master Services Agreement disclaimed borrowed employer status, but the worksite reality suggested otherwise.[81] Witnesses offered contradicting testimony with respect to who had control over the decedent at the time of the accident.[82] In this case, factual disputes of this nature also preclude summary judgment.

---

[77] R. Doc. 156 at 4.

[78] *Tillman v. Johnson*, No. 95-cv-1490, 1998 WL 779843 (E.D. La. Nov. 4, 1998).

[79] R. Doc. 35-4 at § 5.1.3. "Contractor, its employees, and subcontractors shall not be employees, agents, partners, or joint venturers of Company." *Id.*

[80] *Gonzalez Elvir v. Trinity Marine Products, Inc.*, No. 16-cv-814, 2019 WL 1434660 (M.D. La. Mar. 29, 2019).

[81] *Id.* at *2-4.

[82] *Id.*

**II.    Summary Judgment is Denied With Respect to Wood Group's Liability for Negligently Training, Hiring, and Retaining Employees.**

Plaintiffs allege Wood Group is independently liable for its "[f]ailure to properly train employees and/or hiring and/or retaining careless and/or unskilled employees."[83] Wood Group also moves for summary judgment in its favor on this claim. For the reasons set forth above, this negligence claim does not fall within admiralty jurisdiction and the motion must be decided under Louisiana law.

Wood Group has failed to establish there are no material facts in dispute. F.R.C.P. 56, La. C.C.P. 56, and Local Rule 56.1 of this Court require the movant to provide a separate and concise statement of all material facts which the movant contends present no genuine issue. The only statement of undisputed material facts provided by Wood Group is attached to the original motion for summary judgment. The ninth undisputed fact is that "[w]hile in the field for his 7-day shifts, S2 provided Dauzat's safety programming."[84] Even if this statement were true, it would not be a sufficient basis for judgment as a matter of law in favor of Wood Group. In any event, Plaintiffs deny this allegation and point to the Master Service Agreement[85] and to the report of their expert witness, Captain Fazioli's.[86] Plaintiffs point out the Master Service Agreement requires Wood Group to provide safety training to its employees, including Dauzat.[87] The Fazioli report discusses Wood Group's training requirements for workplace safety.[88] Wood Group points to Dauzat's testimony that S2, not Wood Group, provided Dauzat's safety

---

[83] R. Doc. 68 at ¶ XXII(8).
[84] R. Doc. 35-6 at ¶ 9.
[85] R. Doc. 46-4 at § 9.1.
[86] R. Doc. 46-1 at ¶ 9.
[87] R. Doc. 46-4 at § 9.1.
[88] R. Doc. 46-7 at 8-11.

training.[89] At the most, Dauzat testified he would participate in a safety meeting with S2 employees "[a]t least once a week."[90] Dauzat further testified that he received training manuals from both Wood Group and S2.[91] Plaintiffs point to the deposition of Joshua Chaney, Wood Group's corporate representative, who testified that Wood Group paid Dauzat to undergo paid training that was "separate and apart" from his work in the Timbalier Bay Field.[92] There are disputed issues of material fact with respect to Wood Group's negligent training, hiring, and retention of its employees.

Finally, Wood Group argues there is no evidence in the record to establish two essential elements of Plaintiffs' claim—one, that Wood Group breached any duty it had to train Dauzat,[93] and, two, that any breach Wood Group caused damage.[94] Plaintiffs respond by pointing to evidence in the record that was not brought up by Wood Group. First, Plaintiffs point to the affidavit of their expert, Captain Fazioli, who opined that OSHA employee training standards and customary industry practices obligated Wood Group to train its employees and ensure they could safely do their jobs.[95] Plaintiffs point to the express terms of the Master Service Agreement to show Wood Group undertook the "responsibility for training."[96] Wood Group responds that the affidavit of Captain Marc Fazioli impermissibly goes beyond the scope of his expert report.[97] The Court disagrees. Captain Fazioli's report discusses training obligations, including training on

---

[89] R. Doc. 35-6 at ¶ 9.
[90] R. Doc. 35-3, Stephen Dauzat Dep. 32:8-10.
[91] *Id.* at 105:7-25.
[92] R. Doc. 96-3, Joshua Chaney Dep. 57:15-58:2.
[93] R. Doc. 58-1.
[94] R. Doc. 114.
[95] R. Doc. 46 at 23; R. Doc. 46-7.
[96] R. Doc. 46 at 24; R. Doc. 46-4 at §§ 9.1-9.2. Plaintiffs also point to Stephen Dauzat's testimony to show he was initially trained on the job by Baker Energy employee Stuart Edmonson and not by Wood Group. R. Doc. 46 at 23-24; Stephen Dauzat Dep. 99:12-24, 103:9-104:23.
[97] R. Doc. 58 at 9-10.

fall hazards, required by the Occupational Safety and Health Administration (OSHA), which "maintains safety and health regulatory authority with regards to operations and employee activities of M/V MISS MICHELLE."[98] Captain Fazioli's affidavit states "Wood Group had a duty to either properly train, or ensure the proper training of, all of its employees including Mr. Dauzat."[99]

The Court finds Wood Group has not met its burden of showing there are no disputed issues of material fact. Summary judgment is not appropriate on this claim.

### **CONCLUSION**

**IT IS ORDERED** that Defendant Wood Group PSN, Inc.'s Motion for Summary judgment is **DENIED.**

**New Orleans, Louisiana, this 30th day of October, 2020.**

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[98] R. Doc. 46-7 at 7-11.
[99] R. Doc. 46-7 at ¶ 3.